**UNITED STATES DISTRICT COURT**
**For the WESTERN DISTRICT OF WISCONSIN**

**Megan Zacharias,**
c/o Pagel Law Firm
PO Box 620104
Middleton WI 53562                    Case No:
          Plaintiff,                  Case Code: 30301
-vs-

**Sean Hemmer,**
c/o Monona Grove School District,
5301 Monona Drive
Monona, WI 53716,

-and-

**Bill Miller,**
c/o Monona Grove School District,
5301 Monona Drive
Monona, WI 53716,

-and-

**Kristin Sobocinski,**
c/o Monona Grove School District,
5301 Monona Drive
Monona, WI 53716,

-and-

**Monona Grove School District**
5301 Monona Drive
Monona, WI 53716,

                    Defendants.

## Complaint

**Now comes the plaintiff Megan Zacharias by her attorney Briane Pagel** and as and for a complaint against the above-named defendants hereby alleges as follows:

1. Plaintiff **Megan Zacharias** is an individual Wisconsin citizen with no fixed address but who at all times material hereto resided in Dane County, Wisconsin.

2. Defendant **Sean Hemmer** is an individual Wisconsin citizen who at all times material hereto was employed by the Monona Grove School District as a "Grounds Lead."

3. Defendant **Bill Miller** is an individual Wisconsin citizen who at all times material hereto was employed by the Monona Grove School District as the Director of Buildings and Grounds.

4. Defendant **Kristin Sobocinski** is an individual Wisconsin citizen who at all times material hereto was employed by the Monona Grove School District as a Deputy Superintendent.

5. Defendant **Monona Grove School District** is a Wisconsin-organized governmental unit administering schools in the Monona Grove district, with a principal place of business located at 5301 Monona Drive, Monona, WI 53716,

6. The events alleged herein all took place in Dane County, Wisconsin, which is in this judicial district. Zacharias brings her claims pursuant to 28 USC 1331.

7. At the outset of the events alleged herein, Zacharias was hired as a grounds employee at Monona Grove.

8. Zacharias was the only full-time female employee of the District's grounds department at all times material hereto.

9. Almost immediately after being hired, Zacharias began being targeted for disparate and hostile treatment based on her gender.

10. Zacharias was assigned to work in the grounds department; at the time, the only other grounds employee was a man named Bill; Zacharias cannot recall his last name at this time. Bill refused to work with Zacharias or train her in any manner as to what she was required to know or how to fulfill her job duties.

11. Not long after Zacharias was hired, the district hired a man named Devin; Devin was employed in the same capacity as Zacharias in the same department. Bill worked with Devin to train Devin on tasks and equipment that he would not train Zacharias on.

12. Zacharias reported to Monona Grove district, speaking to an employee named Jeff, that she felt she was being discriminated against because Bill would not train her but would train Devin.

13. Jeff told Zacharias that he would look into her allegations. A few days after that meeting, Zacharias was summoned to a meeting with Jeff and an HR employee.

14. In this second meeting, Jeff and HR responded to Zacharias' complaints by separating her from Bill and Devin, deciding to have Zacharias continue to work in Monona while Bill and Devin were to be assigned to Cottage Grove.

15. Zacharias was left with no formal trainer in her job. Zacharias had no immediate help or advice or training available at Monona; her only resource was Scott Murray, who worked in maintenance, and could not help her full time because he had his own duties.

16. Not long after being hired, Devin was promoted to the lead position in the grounds department, giving Devin the ability to assign daily tasks to Zacharias and other grounds people.  There had been no lead in the job during Zacharias' employment prior to Devin's appointment.

17. After Devin became the lead, the separation of duties between Monona and Cottage Grove continued, and Devin continued to refuse to provide Zacharias with supervision or training on all her duties; Devin frequently told Zacharias to "Youtube" tasks to learn how to do them. Devin had been trained on many tasks and equipment by Bill and Zacharias had not been given that same training. Zacharias asked Devin to train her on these tasks and equipment and Devin either refused or delayed the training, making it harder for Zacharias to do her job and causing her to take longer to perform tasks.

18. Approximately 4-5 months after Zacharias started, the District hired an employee named Nate.  Nate was assigned to work with Devin in Cottage Grove.

19. Devin and Nate began signing into the District system to look up when Zacharias arrived at work and when Zacharias took her lunch breaks. Zacharias complained to the District about this and asked that the District restrict their access to her time sheets and work schedule. The District changed the system to restrict access to that information and following that, Nate and Devin began following Zacharias to see what time she arrived and what she was doing during the day.

20. Approximately 1 year after Nate was hired, the District hired a man named Gage. Gage was assigned to Cottage Grove, and Gage and Nate continued surveilling and following Zacharias.

21. Upon information and belief, Nate, Devin and Gage did not follow or surveil any other employees of the District.

22. Because of the surveillance and refusal to help her, Zacharias eventually stopped asking for help or training and simply tried to struggle through her job on her own. Often, the Cottage Grove schools had three employees working, while Zacharias was the only employee for the Monona schools.

23. In or about approximately 2023, Devin left the district and Sean Hemmer became the grounds lead.

24. After Hemmer became the lead, Nate and Gage's surveillance continued, and Zacharias reported this to the District, and asked the District why they were following her. Zacharias frequently complained to District employees about this surveillance, including complaining directly to Bill Miller and Sean Hemmer.

25. On multiple occasions, Zacharias reported to the District Director of Grounds, Bill Miller, that she was being followed and harassed by District employees. Miller laughed in response to Zacharias' reports.

26. When Zacharias reported the following and harassment to Sean Hemmer, Sean responded that she should "not let it bother her." Later, Sean acknowledged that he saw Nate and Gage watching her and that there was no reason for them to do that. Sean reported to Zacharias that he had talked to Nate and Gage; following this, the surveillance stopped for a brief period of time, but it started up again.

27. At this point Zacharias began reporting this behavior to Kristin Sobocinski, a District employee, making 2 or 3 reports to her. Zacharias never saw any action taken in response to her complaints and there was no change in Nate and Gage's behavior following her reports to Sobocinski and the surveillance and harassment continued.

28. At times, Nate and Gage and Devin engaged in particular acts of harassment; for example, on one occasion Devin and Nate altered a part on a push mower to make it inoperative, then refused to help Zacharias get the mower operating. After Zacharias was unable to get it working, they confessed to what they had done and laughed and said it was just a joke. Upon information and belief "jokes" such as this were never played on male employees.

29. At another time, Nate threatened to cut the lock off of Zacharias' locker. Nate wanted a piece of equipment which Zacharias had locked in her locker. Nate messaged Zacharias asking about the equipment when she was out sick, and Zacharias said the equipment was

in her locker. Zacharias offered to come retrieve the equipment for him, but Nate said he was just going to cut the lock off of her locker. Zacharias objected to that and told Nate not to cut her lock off.

30. Nate ordered Zacharias to not lock the equipment up in the future, even though Zacharias had been allowed to do this up until that point.

31. Zacharias called Gary True, a District employee, to complain about Nate's conduct. She also tried to confirm with Sean that she had permission to lock up the equipment, but Sean denied that he had given her permission to do so, despite the fact that he had in fact told Zacharias it was permissible.

32. When Zacharias returned to work she observed marks on her lock indicating that someone had attempted to cut her lock off.

33. On another occasion, Zacharias told her supervisors that she could not do certain work snow clearing because of her medical conditions, and she was told that if she could not do the job she should quit.

34. Zacharias was frequently pulled from one task to another, being called away from what she was doing to be told that she had to do other jobs; when she would try to do the new jobs she had been assigned, she would then be criticized for not finishing the task she had been working on. When Zacharis responded that it was difficult to finish one task when she was being pulled off of that and assigned to a new task, she was told that she should get medication to help her.

35. On February 21, 2024, as part of her regular job duties, Zacharias attempted to clean the high school grounds shop floor. She used a container of "Orange Eddy Solvent Degreaser" that was in the shop. This canister was not labeled as containing any harmful chemicals or as being flammable.

36. In fact, "Orange Eddy" contains kerosene and is flammable.

37. Zacharias was unable to smell the kerosene odor because of an illness, and cleaned the shop floor with it. She was later told by a supervisor that she should not have done so and that this presented a safety risk.

38. Zacharias attempted to look in the district database to access information about the chemical in order to facilitate cleanup, but the database was password protected and she could not get into it.

39. The "Orange Eddy" was in fact not listed in the district's database as a chemical the district had on hand, and there was no warning labeling that would have advised Zacharias of any issues in using the chemical.

40. Zacharias then took appropriate steps, including using safety gear, to clean the Orange Eddy, scraping as much as she could back into the barrel and then cleaning the remaining chemical with an oil drying agent, followed by using Dawn soap and water.

41. Zacharias used appropriate equipment to capture and dispose of chemical that had gone into the overflow holding drain.

42. On March 11, 2024 the District gave Zacharias a written warning related to the Orange Eddy incident.

43. Zacharias responded to the written warning with a rebuttal and explanation of the incident, defending herself and objecting to any disciplinary action resulting from the Orange Eddy incident.

44. On June 18, 2024, Zacharias emailed the District to report concerns about the restrictions being placed on summer help, noting that in the past summer workers had been allowed to use large equipment and District vehicles, and requesting that they continue to be allowed to do so; Zacharias raised these concerns because Gary had been restricting the summer workers' ability to help her in her daily tasks, even though in the past summer workers had been allowed to use large equipment and District vehicles, and even though this use was necessary to allow Zacharias to effectively get her own work done.

45. The District responded by saying that Gary could restrict workers in this way, and that this would be the protocol regardless of what had been done in the past.

46. Also during the month of June, 2024, Zacharias reported to union her concerns about the summer help, including communicating to the union that she believed one worker was being treated differently because of a hearing impairment.

47. In her communications with the union in June 2024 Zacharias raised concerns about her own mental health, and also asked how to prevent being retaliated against for helping the union.

48. On July 18, 2024, Zacharias escalated her summer help concerns to Kristin Sobocinski at the District. Zacharias reported her concerns of disparate treatment of hearing-impaired

workers and unfair restrictions on summer workers to Sobocinski. To Zacharias' knowledge, Sobocinski refused to investigate or rectify the situation.

49. Zacharias began experiencing a mental health crisis due to her work concerns in June 2024. She took four days of vacation to try to cope with this.

50. When she came back to work, Zacharias asked for help to get caught up on her work, such as mowing, and was questioned about why she was getting help on her work. In addition, during this time, Gary True spoke to Zacharias and made her feel as though he was minimizing her mental health issues in what appeared to be an effort to dissuade her from taking time off from her mental health.

51. The four days off did not resolve her mental health crisis, and the events after returning to work including the conversation with Gary True exacerbated the crisis, and Zacharias had to take FMLA leave for her mental health, taking approximately 1-2 weeks.

52. After she returned the conditions remained the same. Zacharias, believing that there was little that could be done, simply tried to keep doing her job. She did report to Sobocinski what Gary True had done in response to her time off. Sobocinski did not take any action in response to that report, to Zacharias' knowledge.

53. On December 2, 2024, the District met with Zacharias, and then on December 4 sent Zacharias a Letter of Warning And Expectation, in which it imposed requirements including:

   a. Requiring Zacharias to work only her "regular hours" of 6 am to 2:30 p.m., with a half hour unpaid lunch, and requiring her to get approval from her supervisor to come in early or stay late, and

   b. "Focus[ing] on the priorities of [her] job before doing special non-urgent projects and tasks," giving a sole example of the differences between the two, and

   c. Prohibiting Zacharias from giving any directions or training to summer grounds staff workers,

54. Zacharias had prior to this not been told there were "regular hours" and had not been required to get approval to come in early or stay late on any formal basis.

55. Also on December 2, 2024, the District claimed it did not have a record of her rebuttal for the February incident and told her to resubmit it.

56. On December 19, 2024, Zacharias provided the District with a formal rebuttal and response to the December 2 letter, objecting to any imposition of discipline or negative employment records.

57. Thereafter, upon information and belief, the District began using video camera footage to monitor Zacharias' work.

19. Beginning in February 2025, Zacharias began being assigned dangerous tasks at work, isolated from other workers, and was targeted with verbal and physical insults and attacks.

20. These actions made Zacharias feel unsafe at work. Zacharias believed these actions were taken because of her ongoing complaints because she is a female and because of her mental health issues.

21. In March 2025, Zacharias repeatedly notified her union representative of her concerns.

22. In March 2025, Zacharias had a hysterectomy and was out of work for six weeks on medical leave.

23. When Zacharias came back after this leave, the conditions of employment remained the same.

24. On or about June 18, 2025, Zacharias, experiencing a mental health crisis as a result of the conduct directed at her by the District and its employees, requested FMLA leave.

25. Around this time, Zacharias spoke with district employee Maria Shelton and informed her of her condition and the causes of it.

26. On July 11, 2025, Zacharias made a formal request that the union assist her and intervene to stop what Zacharias viewed as retaliation, harassment, discrimination and workplace misconduct. In that request, Zacharias noted she was on FMLA leave and said that she did not believe she could return to work safely.

27. On July 21, 2025, Zacharias' FMLA was extended for six weeks by her health care provider. Zacharias immediately notified the district of this extension.

28. On July 31, 2025, Zacharias emailed Tim Gollup, MGEA President, to submit what she termed a formal grievance documenting in detail her complaints and history of employment, including specifically complaining of harassment and disparate treatment.

29. Zacharias asked Gollup, who was also a teacher at the District, to file a union grievance, to review what Zacharias viewed as a breach of her privacy by Sobocinski, to investigate

the use of surveillance video to monitor Zacharias, and for administrative leave and protection during the investigation.

30. On August 1, 2025, Zacharias emailed Gollup following up on her complaints, and said that she had not yet filed a complaint with the EEOC, but was ready to do so in order to address her concerns and fears.

31. Although Zacharias' FMLA leave expired in the summer of 2025, she was still suffering a mental health crisis including suicidal thoughts, and worried that if she returned without the investigation and protections she had requested her mental health would suffer more.

32. Zacharias by that point was terrified of returning to work.

33. On September 25, 2025, Zacharias' employment was terminated, with the District claiming that Zacharias had "resigned." Zacharias had not resigned; the District treated her continued absence as a resignation. Upon information and belief Sobocinski was the person who decided to terminate Zacharias' employment.

34. During her time as a district employee, Zacharias believed that employees should have been given a raise when they weren't, and in response gathered and submitted wage data from surrounding school districts, and delivered that information to a union representative and spoke to a Monona Grove HR employee about this issue, advocating for raises for those employees.

### First Cause of Action:

### Discrimination/Hostile Work Environment:

35. Reallege and incorporate the foregoing as though set forth fully at this point.

36. Zacharias was subjected to sexually motivated discrimination and a hostile work environment by her co-workers and grounds lead.

37. Defendant Monona Grove, and defendants Hemmer, Miller and Sobocinski, knew or should have known of the harassment and hostile work environment, and failed to take prompt remedial action reasonably calculated to end the harassment.

38. The harassment and conduct engaged in by Zacharias' coworkers was severe and pervasive; it continued for years and was engaged in on an almost daily if not daily basis, making Zacharias' work more difficult and time-consuming, causing her to worry about her personal property both while she was at work and when she was off work, caused and

exacerbated mental health crises that included suicidal thoughts, and included comments designed to minimize Zacharias' fears and mental health issues, belittle her.

39. Zacharias was subjected to limitations and restrictions that were not placed on male employees working in the same department at the same level, and had the conditions of her employment altered throughout her term of employment to her detriment.

40. Further, Zacharias, as a woman, belongs to a class protected by Title VII.

41. At all times material hereto, Zacharias met her employer's legitimate expectations for her work.

42. Zacharias suffered an adverse employment action as a result of the discrimination, namely, her job was terminated.

43. Zacharias' coworkers were not similarly treated: none of her Grounds coworkers were terminated from employment during the time Zacharias was there.

## Second Cause of Action:

## Retaliation:

44. Reallege and incorporate the foregoing as though set forth fully at this point.

45. Zacharias' conduct as alleged herein are statutorily-protected rights; to wit, Zacharias has a statutorily-protected right to present information and grievances to her union, to lobby her employer for fair treatment of coworkers, and to complain to her employer that she believes she is being targeted and mistreated because she is female, and to threaten to complain to the EEOC.

46. Defendants took actions that were materially adverse to Zacharias including but not limited to restricting Zacharias' work more than they restricted similarly-situated employees' work, and by terminating Zacharias.

47. Upon information and belief, defendants took the actions alleged herein because Zacharias engaged in the statutorily-protected rights alleged herein above.

48. Defendants' conduct resulted in a constructive discharge of Zacharias; defendants' refusal to ameliorate the working conditions and refusal to try to protect Zacharias, as well as engaging in retributive and punitive behavior, made Zacharias' working conditions objectively intolerable and prevented Zacharias from returning to work in September

2025, and defendants were aware of the conditions but failed to take any action to correct them.

## **Damages:**

49. Reallege and incorporate the foregoing as though set forth fully at this point.

50. Zacharias has suffered damages including but not limited to the loss of income and the loss of property as a result of the loss of income, as a result of the foregoing.

51. Zacharias has as a result of the foregoing suffered extreme and disabling emotional distress and mental stress and anxiety, with such distress interfering with her ability to work, to enjoy life, to engage in ordinary social behaviors, and otherwise to operate in a functional manner. Zacharias at times was driven to suicidal thoughts as a result of defendants' conduct as alleged herein.

52. Defendants' conduct was malicious and/or recklessly indifferent to Zacharias' rights, and as a result Zacharias is entitled to an award of punitive damages.

WHEREFORE plaintiff requests the Court her such damages, costs, fees and other relief as are just and equitable.

PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES IN THIS ACTION.

Dated: July  15, 2026                              **Pagel Law Firm**
                                                  *Electronically signed by:*

                                                  */s Briane Pagel*
                                                  Bar No: 1025514
                                                  Plaintiff's Attorney

PO Box 620104
Middleton, WI 53562
(608) 206-4324
briane@pagellawfirm.com